# United States District Court

_____WESTERN_____ **DISTRICT OF** _____NEW YORK_____

UNITED STATES OF AMERICA

v.

| | |
|---|---|
| [1] JAMES REED, a/k/a FATS | [11] JERMAINE LEATHERWOOD |
| [2] BYRON COBB, a/k/a COBB | [12] JAMAR PAUL, a/k/a CROOK |
| [3] JAMARIO REED, a/k/a POOH | [13] JAYSON BURRUSS, a/k/a WHITEBOY |
| [4] SHONIQUE LOMAN | [14] SHELTRICE RHODES |
| [5] CLINTON BROWN | [15] SEAN BROWN |
| [6] THEODORE HUFFMAN | [16] FLOYD FISHER, a/k/a SLEEP |
| [7] CURTIS MOSS | [17] TIESHA SCOTT |
| [8] KEVIN YOUNG | [18] LAFAYETTE MITCHELL |
| [9] JAY PAUL | [19] CHRISTOPHER HUFF |
| [10] NORMA THOMPSON | |

**CRIMINAL COMPLAINT**

**CASE NUMBER 06-M- 1078**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief; that between on or about August 1, 2005, and on or about May 25, 2006, at Buffalo, New York, in Erie County, in the Western District of New York, the defendants did, knowingly, intentionally and unlawfully possess with intent to distribute and distribute a quantity of a mixture and substance containing cocaine base, a Schedule II controlled substance, and knowingly, intentionally and unlawfully conspired with others, known and unknown, to possess with intent to distribute, and to distribute, a quantity of a mixture and substance containing cocaine base, a Schedule II controlled substance, and did unlawfully use a communication facility to commit a drug felony.

All in violation of Title 21, United States Code, Sections 841(a)(1), 846 and 843(b).

I further state that I am a Special Agent with the Federal Bureau of Investigation and that this complaint is based on the following facts:

**SEE ATTACHED AFFIDAVIT**

Continued on the attached sheet and made a part hereof:     (✓) Yes     ( ) No

X _____

JAMES A. JANCEWICZ
Special Agent
Federal Bureau of Investigations

Sworn to before me and subscribed in my presence,

June 21, 2006     at     Buffalo, New York
Date                          City and State

HON. LESLIE G. FOSCHIO, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

# AFFIDAVIT

STATE OF NEW YORK   )
COUNTY OF ERIE      )SS:
CITY OF BUFFALO     )

I, **JAMES A. JANCEWICZ**, being duly sworn, deposes and says:

1.   I am a Special Agent of the Federal Bureau of Investigation (FBI).   As such, I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2.   I have been so employed as a Special Agent of the FBI for approximately nine years.   Prior to my employment with the FBI, I was employed for approximately six years as a Special Agent with the United States Customs Service in San Francisco, California. During my employment with both the FBI and United States Customs Service, your affiant has participated in investigations concerning drug trafficking, organized crime and public corruption matters. I am familiar with how controlled substances are obtained, diluted, packaged, distributed, sold and used in the framework of drug trafficking   and   how   drug   traffickers   utilize   electronic

communications to facilitate their illegal activities. I have participated in several investigations which have employed the interception of wire, oral and electronic communications authorized by the Federal Courts in the Western District of New York and other judicial districts. As a result of my training and experience, I am familiar with the language, conduct and customs of people engaged in narcotics conspiracies. My investigative experience detailed herein, as well as the experience of other law enforcement agents who are participating in this investigation, serve as the basis for the opinions and conclusion set forth herein.

3. To date, this investigation is based on intercepted telephone conversations, record checks, physical surveillance, interviews of witnesses, information provided from reliable confidential sources, consensual recording, pen registers, telephone toll records, search warrants, information from files of the FBI, and information received from other federal, state and local law enforcement agencies.

4. This Affidavit is submitted in support of a criminal complaint charging **JARIEL COBB**, a/k/a DOOBIE, with violating Title 21, United States Code, Section 848 (continuing criminal enterprise), Title 21, United States Code, Section 841(a)(1) (distribution of a controlled substance), Title 21, United States

Code, Section 843(b) (use of a communication facility in furtherance of a controlled substance felony), Title 21, United States Code, Section 846 (conspiracy to commit a controlled substance felony); **JAMES REED**, a/k/a FATS, **BYRON COBB**, a/k/a, COBB, **JAMARIO REED**, a/k/a POOH, **SHONIQUE LOMAN**, **CLINTON BROWN**, **THEODORE HUFFMAN**, Curtis MOSS, **KEVIN YOUNG**, **JAY PAUL**, **NORMA THOMPSON**, **JERMAINE LEATHERWOOD**, **JAMAR PAUL**, a/k/a CROOK, **JAYSON BURRUSS**, a/k/a WHITEBOY, **SHELTRICE RHODES**, **SEAN BROWN**, **FLOYD FISHER**, a/k/a SLEEP, **TIESHA SCOTT**, **LAFAYETTE MITCHELL** and **CHRISTOPHER HUFF** with violations of Title 21, United States Code, Section 841(a)(1) (distribution of a controlled substance), Title 21, United States Code, Section 843(b) (use of a communication facility in furtherance of a controlled substance felony) and Title 21, United States Code, Section 846 (conspiracy to commit a controlled substance felony).

5.     In August 2005, the FBI, Buffalo Police Department, New York State Parole, United States Marshals Service, Bureau of Alcohol Tobacco and Firearms and the New York State Police initiated an investigation into the drug trafficking activities of the JARIEL COBB. As a result of this investigation, evidence indicates that JAMES REED, BYRON COBB, JAMARIO REED, SHONIQUE LOMAN, CLINTON BROWN, THEODORE HUFFMAN, CURTIS MOSS, KEVIN YOUNG, JAY PAUL, NORMA THOMPSON, JERMAINE LEATHERWOOD, JAMAR PAUL, JAYSON

- 3 -

BURRUSS, SHELTRICE RHODES, SEAN BROWN, FLOYD FISHER, TIESHA SCOTT, LAFAYETTE MITCHELL, CHRISTOPHER HUFF and others, known and unknown, operate an organization that is involved in the large-scale distribution of cocaine in Buffalo, New York. Specifically, JARIEL COBB, JAMES REED and BYRON COBB are responsible for obtaining, and arranging for the transportation of, multi-kilogram quantities of cocaine to Buffalo, New York for distribution by several individuals who are directly supervised by JARIEL COBB.

6. As part of the investigation, on February 2, 2006, the Honorable William M. Skretny, United States District Court Judge, Western District of New York, authorized the interception of telephone numbers (716) 903-2590 and (716) 444-2474. These telephones were used during the course of this investigation by JARIEL COBB, NORMA THOMPSON and others.

7. As part of the investigation, on March 14, 2006, the Honorable William M. Skretny, United States District Court Judge, Western District of New York, authorized the interception of telephone number (716) 903-2557 and the continued interception of (716) 444-2474. On April 14, 2006, the Honorable Richard J. Arcara, authorized the continued interception of telephone number (716) 903-2557 and (716) 444-2474 for an additional 30 day period. Furthermore, as part of the investigation, on April 20, 2006, the

Honorable William M. Skretny, United States District Court Judge, Western District of New York, authorized the interception of telephone numbers (716) 903-8167 and (716) 903-8168. These telephones were all used by JARIEL COBB during the course of this investigation.

8.     Based upon intercepted telephone conversations, it has been determined that JARIEL COBB is the leader of a large cocaine distribution organization based in Buffalo, New York. During 1995, JARIEL COBB was arrested by the FBI for conspiracy to distribute cocaine.   At the time, COBB was a member of the Goodyear Crew Street Gang.    JARIEL COBB oversees all aspects of his drug distribution organization on a daily basis. Intercepted telephone conversations and confidential source information indicate that JAMES REED, BYRON COBB and JAMARIO REED are actively involved in the distribution of cocaine and the collection of drug proceeds from COBB's Organization.

9.     Intercepted telephone conversations have also indicated that JARIEL COBB's most recent source of cocaine supply is located in New York City.   As a result of this investigation, federal agents seized five kilograms of cocaine from two drug couriers who were used by JARIEL COBB, JAMES REED and BYRON COBB to transport cocaine to Buffalo in April 2006.   JARIEL COBB paid his New York

City source of cocaine supply approximately $100,000 for the seized cocaine. In addition, during September 2005, this organization was robbed in Detroit, Michigan of approximately $230,000 which was derived from the sale of cocaine in Buffalo. This organization is responsible for the distribution of cocaine to dozens of mid-level cocaine and crack cocaine dealers in Buffalo.

10.   The FBI has also developed information that JARIEL COBB's Drug Trafficking Organization is believed to be involved in numerous violent acts to include homicides, weapons trafficking and the attempted shooting of a Buffalo Police Officer. During the course of this investigation, FBI Agents and Buffalo Police Officers, took action to prevent the shooting of an individual located at 215 Box Street. Furthermore, during April 2005, members of this organization assisted JAHAUN RICHARDSON in eluding law enforcement officers.   RICHARDSON, who was wanted for questioning regarding a homicide, was concealed by members of this criminal organization.   As part of their drug trafficking operation, this organization regularly used violence, or the threat of violence, to support its drug trafficking activities.

## INFORMATION RECEIVED FROM CONFIDENTIAL SOURCES

11.   The Confidential Sources (CS's) detailed in this Affidavit have provided information to the FBI which has been corroborated through independent investigation, by information received from other confidential and reliable sources, and by information independently and separately from other law enforcement agencies.   The information provided by the CS's has been found to be accurate and reliable and has never proved to be false or misleading.   The information provided by CS's has resulted in the identification of other individuals believed to be involved in drug trafficking in Buffalo, New York.

12.   The CS's have advised SAs of the FBI that the CS's information is based upon either personal observations, or personal conversations either directly with the individual involved or with persons the CS's know to be closely associated with the individuals.

## CONFIDENTIAL SOURCE ONE

13. Confidential Source One[1] (hereinafter, "CS-1") has provided information to the FBI for approximately one year. The information provided by CS-1 has been used in multiple Title III Affidavits and has resulted in the arrests of approximately 19 other individuals for federal drug trafficking violations. Prior to his cooperation, CS-1 was detained by the FBI relative to an ongoing federal drug trafficking investigation. CS-1 is cooperating in hopes of not being charged with federal drug trafficking violations and for financial gain.

14. During September 2005, CS-1 advised the FBI that JARIEL COBB was distributing large quantities of crack cocaine in Buffalo, New York. CS-1 indicated that COBB operates a cocaine distribution group operating on the east side of Buffalo, New York.

## CONTROLLED DRUG PURCHASES INVOLVING JARIEL COBB AND JAMES REED

15. Between September 2005 until January 2006, at the direction of the FBI, CS-1 made five controlled drug purchases from JARIEL COBB. The controlled drug purchases are outlined infra:

---

[1] All the CS's in this Affidavit are referred to as being of the male gender regardless of their true gender.

- 8 -

a. On September 29, 2005, CS-1 received a telephone call from COBB. CS-1 spoke with COBB using vague and cryptic terminology. After the telephone conversation, CS-1 explained the cryptic language used during the conversation was in fact drug language that related to the purchase of a quantity of crack cocaine. Based on your affiant's training and experience, it is my opinion that drug dealers rarely speak openly about drug transactions on the telephone. Your affiant is also aware, based on interviews with confidential sources as well as information uncovered over the course of this investigation, that JARIEL COBB is particularly cautious about how he discusses his drug business on the telephone because his previous conviction for conspiracy to distribute cocaine was the result of an investigation involving intercepted telephone conversations.

b. Later on September 29, 2005, at the direction of the FBI, CS-1 met with COBB in the vicinity of 211 Box Street, Buffalo, New York. COBB made a direct connect telephone call to an individual nicknamed FATS, (believed to be JAMES REED). While waiting at the residence, CS-1 observed JAMARIO REED. After waiting approximately 46 minutes COBB provided CS-1 a quantity of crack cocaine in exchange for $2,900 of FBI funds. COBB provided CS-1 with approximately 78.9 grams of crack cocaine. The suspected crack

cocaine later tested positive for the presence of cocaine by the DEA/Northeast Laboratory.

c.     On October 20, 2005, at the direction of the FBI, CS-1 called COBB and arranged a meeting for the purpose of purchasing crack cocaine. At the direction of the FBI, CS-1 met COBB at 211 Box Street, Buffalo, New York. During the meeting, COBB instructed an unknown individual to provide CS-1 a quantity of crack cocaine in exchange for $3,450 of FBI funds. At the direction of COBB, the unknown individual provided CS-1 with approximately 233.8 grams suspected crack cocaine. Also present during the transaction was JAMES REED.    The suspected crack cocaine later failed to test positive for the presence of cocaine by the DEA/Northeast Laboratory.

d.     Based on intercepted telephone conversations, and information provided by CS-2, CS-4, CS-5 and CS-6, as outlined infra, your affiant believes that just prior to this controlled drug purchase COBB had been robbed of approximately $230,000. COBB was robbed while in Detroit, Michigan attempting to purchase several kilograms of cocaine. Furthermore, your affiant believes that during this time COBB was attempting to obtain a large amount of cash in order to purchase a large quantity of cocaine to replace his loss in Detroit.

e.   On November 21, 2005, CS-1 met COBB at 211 Box Street, Buffalo, New York. In addition, CS-1 observed COBB talking with JAMES REED prior to providing CS-1 with crack cocaine. During the meeting, COBB provided CS-1 with approximately 38.9 grams of cocaine in exchange for $1,500 of FBI funds. The cocaine later tested positive for the presence of cocaine by the DEA/Northeast Laboratory.

f.   On December 14, 2005, CS-1 went to 211 Box Street, Buffalo, New York. Upon arriving at the residence CS-1 determined that COBB was not at the location. CS-1 called COBB and COBB informed CS-1 that he would meet him in a short period of time near 211 Box Street, Buffalo, New York. Subsequently, CS-1 met COBB and another unknown black male in the vicinity of 211 Box Street, Buffalo, New York. During the meeting, COBB provided CS-1 with approximately 35.8 grams of crack cocaine in exchange for $1,500 of FBI funds. The suspected crack cocaine later field tested positive for the presence of cocaine.

g.   On January 12, 2006, CS-1 met COBB at 211 Box Street, Buffalo, New York. During the meeting, COBB instructed CS-1 to wait while COBB entered the residence located at 208 Box Street, Buffalo, New York. Approximately six minutes later, COBB returned and provided CS-1 with approximately 35.7 grams of cocaine in

- 11 -

exchange for $1,500 of FBI funds. The suspected cocaine later field tested positive for the presence of cocaine.

16. All of the above controlled drug purchases between CS-1 and JARIEL COBB were consentually recorded and surveilled by the FBI. During June 2006, CS-1 advised the FBI that JARIEL COBB is still involved in the distribution of multi-kilograms of cocaine in Buffalo, New York. It should also be noted that every conversation between CS-1 and JARIEL COBB regarding a drug purchase involved the same type of vague and cryptic terminology. This vague and cryptic terminology is consistent with the way the other confidential sources spoke with COBB about drug purchases and is also consistent with the language the other defendants charged in this complaint used with COBB when discussing a narcotics purchase with him.

## CONFIDENTIAL SOURCE TWO

17. Confidential Source two (hereinafter, "CS-2") has provided information to the FBI for six months. The information provided by CS-2 has resulted in the identification of individuals believed to be involved in drug trafficking in Buffalo, New York. CS-2 is cooperating with the FBI in hopes of not being charged with a federal drug trafficking violation or the hopes of receiving the

benefit of the government filing a motion to reduce his sentence if charged.

18. On approximately 25 occasions between July 2005 until January 2006, CS-2 has purchased crack cocaine from either JARIEL COBB or JAMES REED. CS-2 would usually purchase approximately one or two ounces of crack cocaine from COBB or REED. COBB distributes one ounce of crack cocaine for $750.

19. During January 2006, prior to CS-2 being a cooperating witness for the FBI, CS-2 purchased a quarter ounce of crack cocaine from JARIEL COBB. CS-2 met COBB at 211 Box Street, Buffalo, New York and COBB retrieved the cocaine from 208 Box Street, Buffalo, New York.

20. CS-2 believes that COBB is responsible for the distribution of approximately two kilograms of cocaine per week in Buffalo, New York. COBB distributes the cocaine from the house located at 211 Box Street, Buffalo, New York. During October or November 2005, JARIEL COBB traveled to Detroit, Michigan to purchase several kilograms of cocaine. While in Detroit, Michigan COBB was robbed of approximately $250,000 by his cocaine supplier. COBB also distributed cocaine from a house on Kilhoffer Street until the BPD executed a search warrant at the residence.

21. During June 2006, CS-2 advised the FBI that JARIEL COBB is still involved in the distribution of multi-kilograms of cocaine in Buffalo, New York.

## CONFIDENTIAL SOURCE THREE

22. Confidential Source three (hereinafter, "CS-3") provided information to the FBI for approximately five months. The information provided by CS-3 has resulted in the identification of other individuals involved in the distribution of cocaine. CS-3 was cooperating with the FBI on behalf of another individual who has pending federal drug trafficking charges. CS-3 was cooperating in hopes of the benefit of the government filing a motion to reduce the other individual's sentence.

23. During August 2005, CS-3 advised the FBI that JARIEL COBB is the head of a drug distribution organization based in Buffalo, New York. COBB's Organization is involved in the distribution of multi-kilograms of cocaine. COBB operates a drug distribution house located at 211 Box Street, Buffalo, New York. In addition, JAMARIO REED, JAMES REED and BYRON COBB, who are all brothers of JARIEL COBB, distribute cocaine on behalf of JARIEL COBB. During August 2005, CS-3 informed the FBI that he could purchase a quantity of cocaine from COBB's Organization.

## CONTROLLED DRUG PURCHASE INVOLVING JAMARIO REED AND BYRON COBB

24. On August 30, 2005, at the direction of the FBI, CS-3 went to 211 Box Street, Buffalo, New York for the purpose of making a controlled purchase of crack cocaine. Upon arriving at the residence, CS-3 met with JAMARIO REED and informed him that he was interested in purchasing an ounce of crack cocaine. REED instructed CS-3 to wait at the residence. While waiting JARIEL COBB, BYRON COBB and JAMES REED arrived at the residence. A short time later CS-3 departed and later returned to 211 Box Street. Upon arriving at the residence, CS-3 met with JAMARIO REED. Also present during the meeting was BYRON COBB. During the meeting, JAMARIO REED provided CS-3 with approximately 28.7 grams of crack cocaine in exchange for $800 of FBI funds. During the meeting, CS-3 observed JAMARIO REED obtain the crack cocaine from his brother BYRON COBB. This conversation was consentually recorded and surveilled by the FBI. In addition, CS-3 observed JAMARIO REED pay BYRON COBB $50 for providing the crack cocaine to CS-3. The suspected crack cocaine later tested positive for the presence of crack cocaine by the DEA/Northeast Laboratory.

25. Confidential Source four (hereinafter, "CS-4") has provided information to the FBI for approximately 11 months. The information provided by CS-4 has resulted in the identification of individuals believed to be involved in drug trafficking in Buffalo, New York. CS-4 was arrested by the FBI and is cooperating in hopes of the benefit of the government filing a motion to reduce his sentence.

26. During July 2005, CS-4 advised the FBI that JARIEL COBB is involved in the distribution of multi-kilograms of cocaine in Buffalo, New York. CS-4 advised that JARIEL COBB distributes cocaine with his brothers JAMARIO REED, a/k/a POOH and JAMES REED, a/k/a FATS. JARIEL COBB, JAMARIO REED and JAMES REED distributed crack cocaine from the residences located at 211 Box Street, Buffalo, New York and 99 Kilhoffer Street, Buffalo, New York.[2] In addition, JAMES REED stores large sums of cash at the residence across the street from 211 Box Street, Buffalo, New York. During the weekend of September 17-18, 2005, JARIEL COBB and an unknown female traveled to Detroit, Michigan to purchase several kilograms of cocaine. While attempting to purchase the cocaine, COBB was

---

[2]On August 18, 2005, the BPD executed a search warrant at 99 Kilhoffer Street, Buffalo, New York. As a result, a small quantity of cocaine was seized from the residence.

robbed of approximately $240,000. The cash was intended to purchase several kilograms of cocaine for subsequent distribution in Buffalo, New York.

## CONFIDENTIAL SOURCE FIVE

27. Confidential Source five (hereinafter, "CS-5") has provided information to the FBI for approximately three months. The information provided by CS-5 has resulted in the identification of individuals believed to be involved in drug trafficking in Buffalo, New York. CS-5 was arrested by federal agents for drug trafficking charges and is cooperating in hopes of receiving the benefit of the government filing a motion to reduce his sentence.

28. During November 2005, CS-5 advised the FBI that JARIEL COBB is a large-scale crack cocaine dealer operating in Buffalo, New York. CS-5 further advised that COBB resides in the area of Box Street and distributes cocaine with his brothers. According to CS-5, approximately four or six months ago, COBB was robbed of at least $100,000 while in Detroit, Michigan attempting to purchase several kilograms of cocaine.

29. Sometime after COBB was robbed in Detroit, Michigan, JARIEL COBB and HOWARD (Last Name Unknown) robbed an unknown drug

trafficker of cocaine and cash in Western New York. It is believed during the robbery, COBB shot and killed the drug trafficker. CS-5 advised the FBI that COBB robbed the unknown drug trafficker to replace the cash which was robbed from him in Detroit, Michigan.

## CONFIDENTIAL SOURCE SIX

30. Confidential Source six (hereinafter, "CS-6") has provided information to the FBI for approximately six months. The information provided by CS-6 has resulted in the identification of individuals believed to be involved in drug trafficking in Buffalo, New York. CS-6 was arrested by the FBI for drug trafficking charges and is cooperating in hopes of receiving the benefit of the government filing a motion to reduce his sentence.

31. According to CS-6, JARIEL COBB, BYRON COBB, JAMARIO REED and JAMES REED are involved in the distribution of cocaine in Buffalo, New York. COBB distributes cocaine from a house located on Box Street, Buffalo, New York. CS-6 was aware that during 2005, COBB was robbed in Detroit, Michigan of approximately $200,000.

32. During early-January 2006, CS-6 observed BYRON COBB and MARTELL JORDAN, a/k/a TELLY in possession of a quarter kilogram of cocaine and four nine millimeter handguns at the residence of 85

Bennett Village Apartments. CS-6 believed COBB and JORDAN were selling an eighth of a kilogram of cocaine to RODRICK WOODS who was also at the location. WOODS purchased the quantity of cocaine for $3,500. JORDAN is a member of COBB's Drug Trafficking Organization.[3]

**CONFIDENTIAL SOURCE SEVEN**

33. Confidential Source seven (hereinafter, "CS-7") has provided information to the FBI for approximately two months. The information provided by CS-7 has resulted in the identification of individuals believed to be involved in drug trafficking in Buffalo, New York. CS-7 was arrested by the FBI for drug trafficking charges and is cooperating in hopes of receiving the benefit of the government filing a motion to reduce his sentence.

34. During March 2006, CS-7, advised the FBI that JARIEL COBB is responsible for distributing multi-kilograms of crack cocaine. COBB operates his drug distribution operation with his brothers JAMES REED, JAMARIO REED and BYRON COBB. In addition, COBB utilizes drug couriers to transport cocaine via Greyhound buses

---

[3]On January 13, 2006, based on this information, the Bureau of Alcohol, Tobacco and Firearms (BATF) and the FBI executed a search warrant at 85 Bennett Village Apartments. As a result, approximately two ounces of cocaine, one nine millimeter handgun and a .22 caliber rifle was seized from the residence.

from New York City to Buffalo.  CS-7 is aware that COBB has a
significant source of cocaine located in New York City.

35.  During 2004 and 2005, CS-7 purchased small quantities of
cocaine from both JAMES REED and BYRON COBB.  JAMES REED primarily
distributes cocaine from 211  Box Street, Buffalo, New York.  CS-7
believes that JAMES REED and BYRON COBB are supplied with cocaine
by JARIEL COBB.

## CONFIDENTIAL SOURCE EIGHT

36.  Confidential  Source  eight  (hereinafter,  "CS-8")  has
provided information to the FBI for approximately two months.  The
information provided by CS-8 has resulted in the identification of
individuals believed to be involved in drug trafficking in Buffalo,
New York.  CS-8 was arrested by state law enforcement officers and
is cooperating in hopes of receiving the benefit of the government
filing a motion to reduce his sentence.

37.  During March 2006, CS-8 advised the FBI that LAFAYETTE
MITCHELL[4] was dealing large quantities of cocaine in Buffalo, New
York.  CS-8 is aware that MITCHELL is obtaining his cocaine from an

---

[4]Currently, LAFAYETTE MITCHELL is on New York State Parole
as a result of a prior state drug felony conviction.

individual who resides on Box Street (believed to be JARIEL COBB).
On one occasion, CS-8 was present with MITCHELL on Box Street for
the purpose of purchasing a quantity of cocaine. Furthermore,
MITCHELL travels to New York City on behalf of his cocaine supplier
(believed to be JARIEL COBB) to transport cocaine from New York
City to Buffalo.

38. Historically, CS-8 has known MITCHELL to operate a "stash
house" in the Buffalo, New York area. The "stash house" was
utilized by MITCHELL to store and package cocaine for distribution.
CS-8 has been to a stash house MITCHELL used to operate on the East
Side of Buffalo with MITCHELL. MITCHELL has since changed
locations of his "stash house."

## SEIZURE OF FIVE KILOGRAMS OF COCAINE

39. On April 25, 2006, based on court authorized intercepted
telephone conversations, and information from CS-7, the FBI
initiated surveillance at the Buffalo Bus Station. Prior to
initiating surveillance, intercepted telephone calls indicated that
JARIEL COBB and JAMES REED were returning to Buffalo from New York
City. In addition, it was believed that JARIEL COBB met his source
of cocaine supply and purchased several kilograms of cocaine. At
approximately 11:05 p.m., JERMELL FONVILLE and RASHEED MILTON were

observed exiting a Greyhound Bus which originated in New York City. FONVILLE and MILTON ran away from law enforcement officers when they were approached. Upon apprehending FONVILLE and MILTON, agents discovered that they were in possession of five kilograms of cocaine. Prior to being apprehended FONVILLE and MILTON instructed a taxi driver to drive them to 98 Ivy Street, Buffalo, New York. 98 Ivy Street is the residence of JARIEL COBB's mother and JAMARIO REED who is the brother of JARIEL COBB. In addition, JARIEL COBB has listed 98 Ivy Street as his place of residence on various legal documents. Both FONVILLE and MILTON were arrested and charged by the FBI and are in federal custody awaiting the disposition of their charges. A review of the cellular telephone which was in the possession of RASHEED MILTON showed an incoming telephone call from (716) 541-7064 on April 26, 2006 at approximately 1:06 a.m. This is the telephone number used by BYRON COBB. At this time, MILTON and the cellular telephone were in the custody of the FBI therefore the telephone was not answered.

## CONFIDENTIAL SOURCE INFORMATION CONCERNING THE SEIZURE OF FIVE KILOGRAMS OF COCAINE ON APRIL 25, 2006

40. The information provided by CS-9 has resulted in the identification of individuals believed to be involved in drug trafficking in Buffalo, New York. CS-9 was arrested by the FBI for drug trafficking charges and is cooperating in hopes of

- 22 -

receiving the benefit of the government filing a motion to reduce his sentence.

41. According to CS-9, during early March 2006, JAMES REED instructed JERMELL FONVILLE to transport cocaine from New York City to Buffalo. REED provided FONVILLE with $60,000 to $80,000 to purchase three kilograms of cocaine. Subsequently, REED drove FONVILLE to the Buffalo Bus Station and purchased round trip bus tickets for FONVILLE and REED to New York City. Upon arriving in New York City, REED and FONVILLE met a Dominican male who supplied them with three kilograms of cocaine. REED and FONVILLE returned to Buffalo via Greyhound Bus.

42. Upon returning to Buffalo, FONVILLE and REED went to 76 Blake Street, upper unit, Buffalo, New York and met REED's girlfriend SHELTRICE RHODES. CS-9 believed RHODES was aware that FONVILLE had transported cocaine to Buffalo and the cocaine was being stored at her residence. While at the house, REED assisted in removing the kilograms of cocaine from FONVILLE and later gave FONVILLE a sum of cash for transporting the cocaine. CS-9 believed that REED stored the cocaine at 76 Blake Street, upper unit, Buffalo, New York.[5]

_____

[5]The lower unit of 76 Blake Street, Buffalo, New York houses a child daycare facility.

43. According to CS-9, approximately one to two weeks later, REED again instructed FONVILLE to transport cocaine from New York City to Buffalo. REED and FONVILLE met at 76 Blake Street, upper unit, Buffalo, New York. REED again provided FONVILLE with $60,000 to $80,000 to purchase cocaine. Upon arriving at Blake Street, FONVILLE and RHODES strapped the cash to their bodies. Subsequently, REED drove FONVILLE and RHODES to the Buffalo Bus Station and purchased bus tickets for FONVILLE, and himself. Upon arriving in New York City, REED, FONVILLE and RHODES met with the same unknown Dominican male and obtained three kilograms of cocaine. REED assisted FONVILLE in strapping two kilograms of cocaine to FONVILLE and one kilogram to RHODES and returned to Buffalo.

44. CS-9 indicated that upon returning to Buffalo, FONVILLE, RHODES and REED went to 76 Blake Street, upper unit, Buffalo, New York. While at the house, REED assisted FONVILLE and RHODES with removing the kilograms of cocaine from their bodies. REED later gave FONVILLE a sum of cash for transporting the cocaine. CS-9 believed that REED stored the cocaine at 76 Blake Street, Buffalo, New York.

45. During late April 2006, REED instructed FONVILLE to transport cocaine from New York City to Buffalo the following day. During the evening of April 24, 2006, REED picked-up FONVILLE in

- 24 -

a cab outside of 211 Box Street, Buffalo, New York. The cab drove REED and FONVILLE to 92 Bissell Street, upper unit, Buffalo, New York. Upon arriving at the residence REED obtained $60,000 to $80,000 from somewhere in the residence. An unknown female (believed to be CATRINA FOMBY) resides at 92 Bissell Street and REED instructed FONVILLE to strap the cash to his body. Subsequently, REED drove FONVILLE to the Buffalo Bus Station and met RASHEED MILTON. REED informed FONVILLE that MILTON would also be traveling to New York City to transport cocaine to Buffalo for BYRON COBB. MILTON was also carrying a large sum of cash on his person which belonged to BYRON COBB. REED purchased round trip bus tickets for FONVILLE, MILTON and himself.

46. Upon arriving in New York City, REED, FONVILLE and MILTON obtained five kilograms of cocaine from the same unknown Dominican male. REED assisted FONVILLE and MILTON in strapping three kilograms of cocaine to FONVILLE and two kilograms of cocaine to MILTON. BYRON COBB was also in New York City and oversaw the cocaine purchase with REED. Subsequently, FONVILLE and MILTON returned to Buffalo via Greyhound Bus.

47. Upon returning to Buffalo, FONVILLE and MILTON entered a taxi at the Buffalo Bus Station and instructed the driver to drive them to 98 Ivy Street, Buffalo, New York. Prior to the cab

departing the bus station, FONVILLE and MILTON were arrested by the FBI.

48.  After the cocaine seizure, the FBI intercepted telephone conversations between JARIEL COBB and BYRON COBB arranging for the delivery of five kilograms of cocaine from New York City to Buffalo.

## INTERCEPTED COMMUNICATION

49.  Throughout the course of this investigation, various conversations were intercepted which demonstrate the involvement of the individuals set forth in paragraph four of this Affidavit. The conversations demonstrate the individuals are in possession of and involved in the distribution of, cocaine including using of telephones to commit these crimes. Intercepted conversations with each individual which demonstrate their involvement in drug distribution activity are hereinafter set forth. The intercepted telephone conversations occurred over telephone numbers (716) 903-2590 (identified as target telephone one [TT1]), (716) 444-2474 (identified as target telephone two [TT2]), (716) 903-2557 (identified as target telephone three [TT3]), (716) 903-8167 (identified as target telephone four [TT4]), and (716) 903-8168 (identified as target telephone five [TT5]), are all used by JARIEL COBB and others.

## JARIEL COBB

50. On February 8, 2006, at approximately 2:22 p.m., JARIEL COBB while using (716) 903-2590 received a telephone call from an Unknown Male (UM) at telephone number (716) 603-3464. During the telephone conversation, COBB said "here I come, I'm right next door cousin." The UM told COBB that his man had to go pick up his "money." Based on the telephone conversation, it is believed that the UM is arranging to meet with COBB to conduct some type of drug trafficking activity.

51. On February 10, 2006, at approximately 1:48 p.m., JARIEL COBB, while using TT1, received a telephone call from an individual who identified himself as "LOUIS" at telephone number (718) 313-5817.[6] LOUIS identified himself as being from 142 and Broadway. During the telephone conversation, LOUIS said "you never called me." LOUIS then said that he has "good stuff now with good price." COBB quickly said "hold on hold on" and then hung up. Based on the telephone conversation, it is believed that LOUIS is one of COBB's cocaine suppliers located in New York City. Based on confidential source information, COBB is known to have a cocaine supplier located in the New York City area.

---

[6]Area code 718 is assigned to the New York City area.

52. On February 10, 2006, at approximately 1:49 p.m., JARIEL COBB, while using TT1 placed a telephone call to LOUIS at telephone number (718) 313-5817. During the telephone conversation, COBB instructed LOUIS to hang up so he can call him from his other telephone. LOUIS then said, "papi I got it good good." COBB then said, "let me call you off this other phone." Based on the telephone conversation, it is believed that COBB is talking with one of his cocaine suppliers. Furthermore, it is believed that COBB has multiple telephones in order to prevent law enforcement from being able to detect his telephone activities.

53. On February 23, 2006, at approximately 4:10 p.m., an individual, who previously identified himself during other intercepted telephone conversations as "LOUIS", using telephone number (718) 313-5817, left a voice mail message for COBB on TT1. During the voice mail message, LOUIS told JARIEL COBB that it has been "two days" that his brother had been there. LOUIS then stated that COBB's brother told him to come back in "five minutes" and he does not know what happened. Based on other intercepted telephone conversations, it is believed that LOUIS is one of COBB's cocaine suppliers located in New York City. Furthermore, based on this telephone conversation, it is believed that COBB's brother had recently met with LOUIS to engage in a drug transaction.

54. On March 1, 2006, at approximately 3:09 p.m., JARIEL COBB, while using TT1 received a telephone call from an unknown female at telephone number (716) 893-3196. During the telephone conversation, the unknown female said "you know Doobie and them got robbed for $230,000." COBB replied by saying that was "six months ago." Based on confidential source information, COBB was robbed of over $200,000 in Detroit, Michigan. COBB was robbed while attempting to obtain a quantity of cocaine.

55. On March 20, 2006, at approximately 7:13 p.m., JARIEL COBB while using TT1, received a telephone call from LOUIS at telephone number (718) 313-5817. During the telephone conversation, LOUIS and COBB talked about an unknown male who resides at "165 Wende." COBB told LOUIS that his man was uncomfortable. LOUIS told COBB that "you see how we work, you see what we got." During the telephone conversation, LOUIS talked with someone in the background in Spanish. LOUIS and the unknown individual in the background talked about five kilograms. Based on previously intercepted telephone conversations, LOUIS has been identified as one of COBB's cocaine supplier. Based on this telephone conversation, it is believed that an associate of COBB's was scheduled to meet with LOUIS to purchase a quantity of cocaine. Furthermore, the reference to five kilograms of cocaine is believed to be a reference to LOUIS making arrangements to sell a large quantity of cocaine in New York City.

56. On April 8, 2006, at approximately 2:47 p.m., JARIEL COBB while using TT3 made a telephone call to LOUIS at telephone number (718) 313-5817. During the telephone conversation, COBB told LOUIS, "I ain't come back down that way yet." COBB then told LOUIS that when he comes back down that way, he will "holler at you boys." LOUIS told COBB that he would be down there sometime next week. Based on this intercepted telephone conversation, and other intercepted telephone conversations, it is believed that COBB was talking with one of his cocaine suppliers located in New York City. Furthermore, it is believed that COBB was planning on going to New York City to meet his cocaine supplier.

57. On April 25, 2006, at approximately 6:44 p.m., JARIEL COBB while using TT3 made a telephone call to an Unknown Female (UF) at telephone number (716) 602-2963. During the telephone conversation, COBB told the UF "I am on way back to where you at" and "I was out of town." The UF asked COBB, "when you be back?" and COBB replied, "later tonight or in the morning." Based on this conversation, and other intercepted telephone conversations, it is believed that COBB, JAMES REED, a/k/a FATS, BYRON COBB and others traveled to New York City to purchase several kilograms of cocaine.

58. On April 25, 2006, at approximately 7:22 p.m., JARIEL COBB, while using TT3, made a telephone call to an UF at telephone